**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES OF AMERICA,            )
                                     )
                                     )
            Plaintiff,               )
                                     )
            v.                       )  No.  05 CR 408
                                     )
P. NICHOLAS HURTGEN,                 )
                                     )
                                     )
            Defendant.               )

**<u>MEMORANDUM OPINION</u>**

The court has under consideration the motion of the defendant
P. Nicholas Hurtgen to dismiss the counts of the Superseding
Indictment that are brought against him.  He is charged with three
counts of mail fraud, three counts of wire fraud and one count of
extortion.

The principal figure named in the indictment is the defendant
Stuart Levine, who at the relevant times was a member of the
Illinois Health Facilities Planning Board, a commission of the
State of Illinois whose approval (in the form of a "Certificate of
Need," or "CON") is required before any hospital, medical office
building or other medical facility can be built.  Generally
speaking, the indictment alleges that Levine, Hurtgen and a third
defendant, John Glennon, devised and intended to devise a scheme to
defraud the State of Illinois of its right to the honest services

of Levine as a member of the Planning Board by requiring certain entities, in order to obtain Planning Board approval of their construction projects, to hire Kiferbaum Construction Company, owned by Jacob Kiferbaum, to do the construction work. It was a part of the scheme that Kiferbaum would inflate the cost of each of the construction projects to include an amount of money that he would then pay as a kickback to Levine. (Indictment ¶ 3 at 8-11.) The kickback for the construction of an addition to the Chicago Medical School ("CMS") was approximately $700,000 and, for the CMS student dormitory, another $1 million. Through a complicated series of transactions involving a charitable trust known as the North Shore Supporting Organization, Levine allegedly obtained a total of $3 million for himself and additional $3 million from another individual "through the use of the $1 million that was fraudulently obtained from CMS by LEVINE and Kiferbaum." (Id. ¶ 3(c) at 10.)

It is further alleged that the scheme included Levine's solicitation of a kickback of approximately $1.5 million from Kiferbaum in connection with the construction of Mercy Hospital's Crystal Lake facility. (Id. ¶ 3(d) at 10-11.) It is alleged that Kiferbaum agreed to pay the kickback "with the exact amount and manner of the payments to be determined at a later date." Levine allegedly secured the Planning Board approval of the project in return for the promised kickback.

Other paragraphs of Count One describe these transactions with the various entities in greater detail, but the important thing to note for purposes of the present motion is that the defendant Hurtgen is not alleged to have had any involvement in these transactions or to have had any knowledge of them. The only facility in regard to which Hurtgen is charged is Edward Hospital, located in Naperville, Illinois.

The indictment alleges that Hurtgen was Levine's intermediary in conveying to Edward Hospital the fact that, unless it hired Kiferbaum, the Planning Board would not approve Edward Hospital's plan to build a hospital and medical office building in Plainfield, Illinois. (<u>Id</u>. ¶ 3(e) at 11.) It is alleged:

> Kiferbaum understood, as a result of his recent prior dealings with LEVINE, in the course of which Kiferbaum had already paid more than $1.6 million in kickbacks and had agreed to pay more, that LEVINE would direct him to pay a kickback in connection with the Edward Hospital projects.

(<u>Id</u>. ¶ 3(a) at 22.) Significantly, this sentence alleges that "<u>Kiferbaum</u> understood," not that "Kiferbaum and Hurtgen" understood. All that is alleged as to Hurtgen is that "HURTGEN assisted in the scheme because he wanted his employer, Bear Stearns, to receive the financing work for the new hospital." (<u>Id</u>. ¶ 8 at 22.)[1]

---

[1] Paragraph 1(h) alleges that "Defendant P. NICHOLAS HURTGEN was employed as a Senior Managing Director in the Chicago office of Bear Stearns & Co., an investment bank that did business and sought to do business with Edward Hospital, Mercy Hospital and the State of Illinois."

A further allegation that may have been intended by the drafter of the indictment to imply knowledge of the kickback scheme by Hurtgen, but falls far short of it, is the following allegation against <u>Levine</u>, describing his failure to disclose the circumstances concerning the Edward Hospital application:

> Notwithstanding his position as a member of the Planning Board, LEVINE intentionally concealed from and failed to disclose to the Planning Board material facts relating to its consideration of Edward Hospital's applications for permits to build the Plainfield hospital and medical office building, <u>including LEVINE's arrangement with Kiferbaum and HURTGEN to pressure Edward Hospital to hire Kiferbaum Construction Company so that Kiferbaum would pay a kickback at LEVINE's direction</u> and Bear Stearns would receive the financing work when the projects went ahead, as well as LEVINE's *ex parte* contacts, both directly and through HURTGEN and Kiferbaum, with Edward Hospital officials regarding Edward Hospital's pending CON applications.

(<u>Id</u>. ¶ 8(t) at 29 (emphasis added).)  This is not an allegation that Hurtgen knew of the kickback.

Hurtgen's basic argument is that, in failing to allege that he knew of the kickback, the indictment does not allege an offense under 18 U.S.C. §§ 1341 and 1346.[2/]  The government's position is that a monetary gain to the defendant or another, or a monetary loss to the employer, is not necessary in order to constitute a deprivation of "the intangible right of honest services" under 18

---

[2/]  In the alternative, he argues that to the extent these statutes permit criminal prosecutions for schemes not involving an intent to obtain a monetary gain, they are unconstitutional on their face and as applied.  We do not need to reach these constitutional arguments, and, for that reason, will not address them.  <u>See</u> <u>Jean v. Nelson</u>, 472 U.S. 846, 854 (1985) ("Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.").

U.S.C. § 1346. It argues that, on the contrary, a violation by Levine of his fiduciary duty to the Planning Board and the State of Illinois to report his *ex* *parte* communications with Edward Hospital, as well as his acting "in excess of his lawful authority" by "steering" the construction contract to Kiferbaum, regardless of whether he was to receive a kickback or not, constituted violations of Illinois criminal statutes and would thereby qualify as deprivations of his honest services.

## DISCUSSION

Each side cites a number of cases from this and other Circuits on the meaning of "honest services." We think two Seventh Circuit cases and one Supreme Court case provide the answer we need.

The most helpful case is United States v. Bloom, 149 F.3d 649 (7th Cir. 1998), because of its clarity and the fact that it was decided after Congress enacted § 1346 in response to the Supreme Court decision in McNally v. United States, 483 U.S. 350 (1987).

The Bloom case involved facts quite different from those at bar, and this is generally true of prosecutions based on the honest services theory. Factual distinctions abound, and much time can be wasted in attempting to compare and distinguish the various scenarios. The more important thing is to try to find the principle of law separating conduct that is a federal crime from conduct that is not. Bloom is addressed to that question. The defendant was a Chicago alderman who, in his capacity as a private

attorney, gave a client advice as to how to use a proxy bidder at a tax scavenger sale and thereby avoid a substantial amount of real estate taxes.   149 F.3d at 650-51.   One of the government's theories was that this deprived the City of Chicago of Bloom's honest services as an alderman because the City would have received a portion of the unpaid taxes.   The government relied on § 1346, which had been enacted in 1988, prior to the tax sale.   See id.

The district court dismissed this portion of the indictment, and, on an interlocutory appeal from the dismissal, the Seventh Circuit affirmed.   The Court rejected the government's argument that every conflict of interest on the part of an alderman-attorney, such as Bloom, amounts to an indictable offense under § 1346:

> The United States seeks to persuade us that Vrdolyak[3] establishes the much broader rule that aldermen and other public employees may not do anything in their private lives that acts against the City's interests--but if its rule were that broad, then every city employee would be required to shop exclusively in Chicago in order to maximize its receipts from sales taxes, and would be guilty of a federal felony if he bought a pair of boots through the mail from L.L. Bean.

Id. at 654.   The Court went on to say:

> Doubtless there is a limiting principle and some conflicts of interest are tolerable; a member of General Motors' board of directors is (legally) entitled to drive a Ford; but it is frightening to contemplate the prospect

---

[3] In re Vrdolyak, 560 N.E.2d 840 (Ill. 1990), where the Illinois Supreme Court held "that another lawyer-alderman violated his ethical duties who represented persons who had legal claims against the City, because any increase in his clients' recoveries necessarily would reduce the City's assets." Bloom, 149 F.3d at 651.

that the federal mail fraud statute makes it a crime punishable by five years' imprisonment to misunderstand how a state court in future years will delineate the extent of impermissible conflicts. Then we would have a federal common-law crime, a beastie that many decisions say cannot exist. E.g., <u>United States v. Bass</u>, 404 U.S. 336, 348, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971); <u>United States v. Hudson</u>, 11 U.S. (7 Cranch) 32, 3 L. Ed. 259 (1812); <u>United States v. Reynolds</u>, 919 F.2d 435, 438 (7th Cir. 1990). <u>See</u> also <u>McNally</u>, 483 U.S. at 360, 107 S. Ct. 2875. Courts have applied this no-common-law-crimes principle to mail fraud prosecutions by holding that violations of state-law fiduciary duties do not turn into mail fraud just because the mails are used in the process. "Not every breach of every fiduciary duty works a criminal fraud." <u>United States v. George</u>, 477 F.2d 508, 512 (7th Cir.1973). <u>See</u> <u>also</u> <u>United States v. Walters</u>, 997 F.2d 1219 (7th Cir.1993), which rejects the idea that all deceits are criminal fraud. But if "not every breach" is criminal fraud, where is the line drawn? Its location cannot be found by parsing § 1341 or § 1346, a profound difficulty in a criminal prosecution.

<u>Id</u>. To find that "limiting principle" the Court turned to a discussion of <u>McNally</u>, the case that had rejected the honest services theory prior to the enactment of § 1346 in 1988:

In <u>McNally</u> the Supreme Court described the intangible rights theory this way: "a public official owes a fiduciary duty to the public, and misuse of his office for private gain is a fraud." 483 U.S. at 355, 107 S. Ct. 2875. <u>This is the theory that McNally disapproved as unsupported by § 1341, and that by enacting § 1346 Congress reinstated</u>. We do not think that § 1346, with its unelaborated reference to "a scheme or artifice to deprive another of the intangible right of honest services", creates criminal liability for events that would not have been crimes before <u>McNally</u>. But if <u>McNally's</u> description of the intangible rights doctrine is accurate, then it is clear that Count I does not charge Bloom with an intangible rights fraud. For it does not charge that he misused his office for private gain. It does not charge that he *used* his office in any way, let alone that he *mis*used it.

> Misuse of office (more broadly, misuse of position) for
> private gain is the line that separates run of the mill
> violations of state-law fiduciary duty-such as Alderman
> Vrdolyak's representation of a client against the
> City-from federal crime. It is how we can give substance
> to the statement in George that "[n]ot every breach of
> every fiduciary duty works a criminal fraud." In almost
> all of the intangible rights cases this circuit has
> decided (before McNally or since § 1346), the defendant
> used his office for private gain, as by accepting a bribe
> in exchange for official action.

Id. at 655 (citations omitted)(emphasis added).

The Court concluded by remarking that, as honest services
cases continue to arise, the requirement of personal gain will be
the test for criminality:

> No one can be sure how far the intangible rights theory
> of criminal responsibility really extends, because it is
> a judicial gloss on § 1341. Congress told the courts in
> § 1346 to go right on glossing the mail fraud and wire
> fraud statutes along these lines. Given the tradition
> (which verges on constitutional status) against
> common-law federal crimes, and the rule of lenity that
> requires doubts to be resolved against criminalizing
> conduct, it is best to limit the intangible rights
> approach to the scope it held when the Court decided (and
> Congress undid) McNally. An employee deprives his
> employer of his honest services only if he misuses his
> position (or the information he obtained in it) for
> personal gain. Count I does not allege that Bloom did
> this and therefore does not state an offense under the
> intangible rights theory.

Id. at 656-57 (emphasis added).

Bloom itself makes clear what the Court meant by "personal
gain." It meant financial gain, and Bloom was not alleged to have
obtained any financial gain from the advice he gave his client. He
may have obtained some personal satisfaction from assisting his
client, and (as the dissent pointed out), may even have anticipated

some repeat business from the client as a result.  But this was not the kind of thing the majority regarded as personal gain.  This reading of <u>Bloom</u> is reinforced by an examination of what the Supreme Court said in <u>McNally</u>, relied upon so heavily by the Seventh Circuit in <u>Bloom</u>.  In <u>McNally</u>, a case involving payments received by various officials of the State of Kentucky, the trial judge gave an instruction that allowed the jury to find the defendant McNally guilty of aiding and abetting mail fraud.  McNally was convicted, and the issue on appeal to the Supreme Court was whether a conviction for mail fraud required a showing that the State had been deprived of money or property.  <u>See</u> 483 U.S. at 360.  The government relied on the honest services theory, which the Court considered in light of the history of the mail fraud statute.  <u>See</u> <u>id</u>. at 356-57.  The Court noted that in 1909 Congress amended the statute to add the words "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" after the original phrase "any scheme or artifice to defraud."  <u>Id</u>. at 357.  The Court then considered whether this amendment might have broadened the reach of the statute to include schemes not "causing deprivation of money or property" and concluded that it did not:

> After 1909, therefore, the mail fraud statute
> criminalized schemes or artifices "to defraud" or "for
> obtaining money or property by means of false or
> fraudulent pretenses, representation, or promises...."
> Because the two phrases identifying the proscribed
> schemes appear in the disjunctive, it is arguable that

they are to be construed independently and that the money-or-property requirement of the latter phrase <u>does not limit schemes to defraud to those aimed at causing deprivation of money or property</u>. This is the approach that has been taken by each of the Courts of Appeals that has addressed the issue: schemes to defraud include those designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly.

As the Court long ago stated, however, the words "to defraud" commonly refer "to wronging one in his property rights by dishonest methods or schemes," and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." <u>Hammerschmidt v. United States</u>, 265 U.S. 182, 188, 44 S. Ct. 511, 512, 68 L. Ed. 968 (1924). The codification of the holding in <u>Durland</u> in 1909 does not indicate that Congress was departing from this common understanding. As we see it, adding the second phrase simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property.

We believe that Congress' intent in passing the mail fraud statute was to prevent the use of the mails in furtherance of such schemes. The Court has often stated that when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language. As the Court said in a mail fraud case years ago: "There are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute." <u>Fasulo v. United States</u>, 272 U.S. 620, 629, 47 S. Ct. 200, 202, 71 L. Ed. 443 (1926). Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has.

<u>Id</u>. at 358-60 (emphasis added) (footnote and some citations omitted).

Another case making clear that financial gain is necessary for a § 1346 violation is <u>United States v. Hausmann</u>, 345 F.3d 952 (7th Cir. 2003). The case involved a $70,000 kickback. The defendants argued on appeal that the mail and wire fraud statutes, including § 1346, were unconstitutionally vague in that they "did not provide them with adequate notice of the criminality of their kickback scheme, and that application of the mail and wire fraud statutes to the facts of this case invites the government arbitrarily to police the fairness of private business transactions through enforcement of criminal statutes." <u>Id</u>. at 958. Rejecting this argument, the Court stated:

> [T]his court's decision in <u>Bloom</u> placed Appellants on notice that criminal liability under the mail and wire fraud statutes — particularly under an intangible-rights theory – attaches to the misuse of one's fiduciary position for personal gain.

<u>Id</u>. (footnote omitted). The Court found it unnecessary to discuss the defendants' argument any further.

<u>Bloom</u>, <u>McNally</u> and <u>Hausmann</u> persuade us that the honest services theory under § 1346 involves a necessary element of financial gain.[4/] As we have already noted, the mail and wire fraud counts of this indictment do not allege that the defendant Hurtgen knew Stuart Levine was expecting to receive any kickback – or any other kind of monetary payment – from Kiferbaum. The question,

---

[4/] It could also be a financial loss to the employer who is deprived of the honest services, see <u>Hausmann</u>, 345 F.3d at 959.

then, is whether this omission renders the indictment insufficient as to Hurtgen.

### The Sufficiency of the Mail and Wire Fraud Counts

We think it is obvious enough that to be guilty of a violation of § 1341, Hurtgen would have had to know that a kickback of money to Levine was expected from Kiferbaum. Nothing by way of a factual allegation in the indictment states that he had such knowledge. The government argues that this is no problem because an indictment is sufficient if it alleges the offense in the language of the statute. Each of the mail and wire fraud counts does allege that the defendants used the wires or mails "for the purpose of executing the above-described scheme and attempting to execute the above-described scheme." See, e.g., Count One at 30. This is statutory language, and a "purpose of executing the above-described scheme" does, at least by implication, indicate a defendant's awareness of the fundamentals of the scheme. One problem the government has in this particular case, however, is that the description of the scheme, while it includes an allegation that there was an understanding between Levine and Kiferbaum that Kiferbaum would pay a kickback to Levine in connection with the Edward Hospital projects, see Count One ¶¶ 8(a), 8(t), there is no allegation that Hurtgen knew about this. Therefore, even if there were any merit to the government's argument that it is sufficient simply to parrot the language of the statute, these references to

-13-

"executing the above-described scheme" do not incorporate any allegation about Hurtgen's knowledge, because there is no such allegation. But the difficulty with the government's argument goes beyond this deficiency. The law is that, whether the language of the statute is included or not, if the <u>facts</u> alleged in the indictment do not constitute an offense, the indictment is subject to dismissal. This was explained in <u>United States v. Risk</u>:

> The government correctly points out that, at the pretrial stage, the indictment ordinarily should be tested solely by its sufficiency to charge an offense, regardless of the strength or weakness of the government's case. The government, however, mistakenly reads the district court's opinion as dismissing the indictment because the government could not prove its case. Rather, the district court found the allegations in the indictment insufficient to state a claim under the CTR statute. <u>Specifically, the indictment alleged that on December 5 and 24, 1985, Risk knowingly and willingly failed to file a CTR for transactions involving more than $10,000. Although this fulfills the elements of a violation of 31 U.S.C. §§ 5313 and 5322 and 31 C.F.R. Part 103, the district court found that the government's characterization of the undisputed facts did not constitute a violation of any statute. In other words, the government's own facts proffered to the defendant and the district court simply did not conform to the allegations in the indictment</u>. The district court found no violation and correctly dismissed the indictment, not because the government could not prove its case, but because there was no case to prove.

843 F.2d 1059, 1061 (7th Cir. 1988) (emphasis added) (citation omitted). <u>See also</u> <u>United States v. Gimbel</u>, 830 F.2d 621, 624 (7th Cir. 1987):

> In order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating. If the acts alleged in the indictment did not

constitute a violation of the law that the defendant has been charged with violating, we must reverse any subsequent conviction based on that indictment.

*    *    *    *

We conclude that the mail and wire fraud counts against Hurtgen must be dismissed for failure to allege an offense.

## The Extortion Count

Count Twenty-four of the indictment is brought under 18 U.S.C. § 1951, which provides in relevant part that:

> (a)  Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be [punished].
>
> (b)  As used in this section--
>  . . .
>> (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

Count Twenty-four incorporates the factual recitations concerning Edward Hospital that are recited in Count One and then goes on to allege that:

> STUART LEVINE and
> NICHOLAS HURTGEN,
> defendants herein, did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendants attempted to obtain property, in the form of a construction contract from Edwards [sic] Hospital, on behalf of and for the benefit of Kiferbaum, with Edward Hospital's consent induced under the color of

> official right, and by the wrongful use of actual
> and threatened fear of economic harm . . . .

The meaning of Count Twenty-four does not leap out from the page.  Some deconstruction is necessary.  The "property, in the form of a construction contract from Edward[] Hospital, on behalf of and for the benefit of Kiferbaum," refers to the property right Edward Hospital had in making a free choice as to which contractor it would hire.[5/]

The inducement "under the color of official right" refers to Levine's alleged misuse of his position on the Planning Board, and the "wrongful use of actual and threatened fear of economic harm" is Levine's statement, relayed through Hurtgen, that unless the Hospital hired Kiferbaum its projects would not be approved by the Board.

Hurtgen's motion to dismiss Count Twenty-four rests on several grounds.  First, he argues that the count is deficient in failing to allege that he knew Levine was to receive a kickback from Kieferbaum.  However, an indictment for extortion need not allege a gain to the extortioner.  It need only allege an economic loss to the victim of the extortion.  United States v. Stillo, 57 F.3d 553, 559 (7th Cir. 1995); United States v. Inigo, 925 F.2d 641, 649-50 (3d Cir. 1991).  Therefore, it is immaterial that Count Twenty-four

---

[5/]Such a property right has been recognized in the cases.  See United States v. Santoni, 585 F.2d 667, 672-73 (4th Cir. 1978); United States v. Tropiano, 418 F.2d 1069, 1075-76 (2d Cir. 1969).

does not allege that Hurtgen knew Levine was to receive a kickback from Kiferbaum.

Another argument that Hurtgen makes is that a private person cannot be charged pursuant to the "under color of official right" provision of § 1951(b)(2). <u>United States v. McClain</u>, 934 F.2d 822, 830 (7th Cir. 1991), however, holds that a private person can be prosecuted under that provision as an aider and abettor.

The principal argument Hurtgen makes is that Count Twenty-four does not allege that he knew Levine was acting "wrongfully" within the meaning of § 1951(b)(2). As we have just seen, the count need not allege that Hurtgen knew anything about a kickback. But what must he have known? The government's position is that the statute covers the violation of a fiduciary duty by a public official who, instead of taking action based on his honest view of the merits of a question, bases his decision on favoritism. Hurtgen argues that this view of the statute would turn it into a vehicle for arbitrary prosecutions of conduct that has never before been considered criminal. It would provide no notice of what is prohibited and give the government unfettered discretion to select what conduct and which defendants will be subjected to prosecution.

The government states that:

> In this case, Court 24 alleges that the state official, Levine, aided and abetted by Hurtgen, threatened to use his official powers to harm Edward Hospital, namely, to deny its application to build, <u>if Edward did not give Levine what he wanted, namely, that Edward award the construction contract to Levine's friend Kiferbaum</u>.

(Government's Response to the Court's Order of January 31, 2007 Concerning Count 24 of the Superseding Indictment at 5-6 (emphasis added).) Thus, the government's extortion theory is similar to its honest services theory of mail and wire fraud: the misconduct of the public official can consist solely of the breach of his fiduciary duty to be objective and impartial in his decision making, and the benefit he receives as a result of the breach might be nothing more than the satisfaction of knowing he has done a favor for a friend.

The "fiduciary duty" aspect of the government's theory strikes us as difficult to apply. It seems to assume that the factual situations will always involve the extremes: the public official will always base his decision strictly on the merits, in which case he is not guilty of extortion; or he will intentionally ignore the merits and base his decision entirely on extraneous factors, such as a desire to do a favor for a friend. But what of the official who has mixed motives – who truly regards his friend as deserving of the contract or other governmental benefit, but still bases his decision, in part, on the fact that the recipient is his friend? Or take the case of two or more competitors for the benefit whom the official truly regards as equally qualified on their respective merits and where the "tie-breaker," resulting in the award to the friend, is the fact of friendship. Would this support a conviction for extortion? Assuming that the government would have the burden

of proving the degree to which favoritism, as opposed to the merits, controlled the decision, what degree would that be? Would the slightest degree be sufficient? How would the jury be instructed?

Turning to the "favor" aspect of the government's extortion theory, the cases it cites involve facts that are more typical of the traditional extortion case in that they involve payments of money. United States v. Holzer, 816 F.2d 304, 310 (7th Cir. 1987), involved a corrupt judge who solicited loans from attorneys who appeared before him. Similarly distinguishable cases cited by the government are United States v. DeMet, 486 F.2d 816 (7th Cir. 1973) (police officers asked for and received cash payments and liquor from tavern owner in return for not enforcing late night parking and closing hour ordinances), and United States v. Hyde, 448 F.2d 815 (5th Cir. 1971) (attorney general of Alabama and his top assistant convicted of extorting payments from life insurance companies and small loan companies under threat of action that would prevent them from doing business in the State).

A case that comes closer on the facts, in that it involved a demand that the victim hire someone, is United States v. Balzano, 916 F.2d 1273 (7th Cir. 1990). The defendant was a fire inspector who was convicted of taking payoffs from business establishments in return for not interfering with their applications for liquor, food and amusement licenses. The owner of one of the establishments

testified that "Balzano required that she hire a particular craftsman to perform construction work as well as demanding $2,500 for himself." Id. at 1286. The owner complied with both demands, hiring the craftsman and paying the $2,500. In affirming the conviction, the Court did not separately discuss the $2,500 payment and the hiring of the craftsman but simply concluded, "[a] rational jury could very properly find the necessary elements of extortion based upon the totality of the evidence presented." Id.

Count Twenty-four does allege that Levine and Hurtgen attempted to obtain Edward's property with its consent "induced under the color of official right." In Holzer, the Court discussed the meaning of extortion "under color of official right":

> It would not help Holzer even if he were the passive recipient of loans, pressed on him by lawyers eager to curry favor with him. Extortion "under color of official right" equals the knowing receipt of bribes; they need not be solicited. That at least is the view in this circuit. . . . In this circuit it is extortion if the official knows that the bribe, gift, or other favor is motivated by a hope that it will influence him in the exercise of his office and if, knowing this, he accepts the bribe.

816 F.2d at 311 (emphasis added) (citations omitted).[6/] While Holzer involved bribes, and the remarks of the Court are obviously focused on bribes as the usual benefit received by the extortioner, the reference to "other favor" suggests that a monetary payment is

---

[6/] The judgment in Holzer was vacated in light of McNally, 483 U.S. 350, which is discussed supra, but the decision is still relevant to this discussion.

not necessarily required. It could be that some favors would qualify as "wrongful" and others would not.

Despite these reservations about the underpinnings of the government's extortion theory, we would be inclined to let Count Twenty-four stand were it not for an additional problem. The count does not allege that Hurtgen knew Levine was intending to decide the Edward Hospital application on the basis of favoritism rather than on the merits. The government might argue that Hurtgen had to know that Levine's insistence upon Kiferbaum was not based on the merits. But nothing in the indictment requires that conclusion. There is no allegation that Kiferbaum was not qualified to do the work or that either Levine or Hurtgen regarded Kiferbaum as unqualified. There is no allegation that Hurtgen had any information that the price charged by Kiferbaum would be higher than the price charged by any other contractor, or that Kiferbaum would be non-competitive in any other way. Nothing in the indictment, as far as Hurtgen is concerned, is inconsistent with the possibility that Hurtgen might have thought Levine was insisting on Kiferbaum precisely because, on the merits, Levine thought Kiferbaum was the best choice. It would be understandable if the government regards this as highly unlikely. The point here is not what the facts might be, but rather what facts are alleged. See Standard Oil Co. of Tex. v. United States, 307 F.2d 120, 130-31 (5th Cir. 1962) ("[N]either by express terminology nor by the facts

otherwise appearing in the indictment is the critical element of a knowing violation set forth.").

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides:

> The indictment or information must be a plain, concise, and definite written statement of <u>the essential facts constituting the offense charged</u> . . . .

Fed. R. Crim. P. 7(c)(1) (emphasis added).  Certainly knowledge is an essential element of extortion; there is no such thing as accidental or negligent extortion.  <u>Inigo</u>, 925 F.2d at 651. Because knowledge is an essential element of the crime, it is an essential <u>fact</u> that must be alleged in the indictment.  Count Twenty-four does not allege that Hurtgen knew that Levine was favoring Kiferbaum for a reason having nothing to do with Kiferbaum's qualifications to do the work.  Therefore, pursuant to Rule 7(c)(1), Count Twenty-four will be dismissed as to the defendant Hurtgen for failure to allege an offense.

## <u>CONCLUSION</u>

The motion of the defendant Hurtgen to dismiss, as to him, those counts of the indictment in which he is named is granted. Counts One through Six and Count Twenty-four of the Superseding Indictment are dismissed as to the defendant P. Nicholas Hurtgen.

DATE:        March 20, 2007

ENTER:     _____

John F. Grady, United States District Judge